## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| YADIRA TORRES, Derivatively on Behalf of Nominal Defendant PRIMO BRANDS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ERIC J. FOSS, C. DEAN METROPOULOS, BRITTA BOMHARD, SUSAN E. CATES, MICHAEL J. CRAMER, JERRY FOWDEN, TONY W. LEE, BILLY D. PRIM, KIMBERLY REED, STEVEN P. STANBROOK, ROBBERT RIETBROEK, JOSEPH ROSENBERG, ALLISON SPECTOR, KURTIS BARKER, DAVIS HASS, and JASON AUSHER, <br><br> Defendants, <br><br> and <br><br> PRIMO BRANDS CORPORATION, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. _____ |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Yadira Torres ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Primo Brands Corporation (herein referred to as "Primo Brands" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available

documents, including the allegations of the complaints filed in the securities class actions captioned *Rosenblum v. Primo Brands Corporation, et al.*, Case No. 3:25-cv-01902-VAB (D. Conn.) (the "*Rosenblum* Action") and *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Primo Brands Corporation, et al.*, Case No. 8:25-cv-03328 (M.D. Fla.) (the "*Retirement Trust* Action" and, with the *Rosenblum* Action, the "Securities Class Actions"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Primo Brands, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Primo Brands against certain officers and members of the Company's Board for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements, as well as breach of fiduciary duty and other violations of state law between at least June 17, 2024 and November 6, 2025, inclusive (the "Relevant Period").

2.      Primo Brands, a beverage distribution company with a portfolio of brands including Poland Spring, Pure Life, and Saratoga, is the product of a merger between Primo Water and BlueTriton.

3.      Throughout the Relevant Period, Company management issued materially false and misleading statements, touting the prospects of the merger and overstating the Company's progress with respect to the integration of Primo Water and BlueTriton.

4.      The truth emerged on November 6, 2025, when the Company significantly reduced

its full year 2025 fiscal guidance, attributable to disruptions in the Company's direct delivery business and "integration issues." On this news, the price of Primo Brands stock declined more than 36%, from a close of $22.66 per share on November 5, 2025 to a close of $14.46 per share on November 7, 2025.

5.     As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, alleging violations of the federal securities laws.

6.     As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Actions, as well as additional losses, including reputational harm and loss of goodwill.

7.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17

C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

9.      Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Primo Brands maintains principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District. Further, the *Rosenblum* Action is pending in this District.

## PARTIES

### Plaintiff

14.     Plaintiff is, and has been at all relevant times, a shareholder of Primo Brands.

### Nominal Defendant

15.     Nominal Defendant Primo Brands is incorporated under the laws of the State of Delaware.

16.     The Company maintains dual headquarters at 900 Long Ridge Road, Building 2,

Stamford, Connecticut 06902 and 1150 Assembly Drive, Suite 800, Tampa, Florida 33607. Primo Brands' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PRMB."

***Individual Defendants***

17.     Defendant Eric J. Foss ("Foss") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board since November 2025 and as a member of the Board since November 2024. Defendant Foss is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Foss received $295,808 in 2024 in compensation from the Company.

18.     Defendant C. Dean Metropoulos ("Metropoulos") has served as a member of the Board since November 2024. Defendant Metropoulos previously served as Chairman of the Board from March 2021 until November 2024. Defendant Metropoulos is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Metropoulos received $10,586,537 in 2024 in compensation from the Company.

19.     Defendant Britta Bomhard ("Bomhard") has served as a member of the Board since November 2024 and serves as a member of the Audit Committee. Defendant Bomhard is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Bomhard received $290,399 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Bomhard beneficially owned 57,302 shares of Primo Brands common stock, worth roughly $1.8 million.[1]

20.     Defendant Susan E. Cates ("Cates") has served as a member of the Board since

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $31.61 per share closing price of Primo Brands common stock on March 7, 2025.

November 2024 and serves as Chair of the Audit Committee. Defendant Cates is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Cates received $307,003 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Cates beneficially owned 67,156 shares of Primo Brands common stock, worth roughly $2.1 million.

21. Defendant Michael J. Cramer ("Cramer") has served as a member of the Board since November 2024 and serves as a member of the Audit Committee. Defendant Cramer is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Cramer received $428,401 in 2024 in compensation from the Company.

22. Defendant Jerry Fowden ("Fowden") has served as a member of the Board since November 2024. Defendant Fowden is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Fowden received $391,228 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Fowden beneficially owned 1,286,759 shares of Primo Brands common stock, worth roughly $40.7 million.

23. Defendant Tony W. Lee ("Lee") has served as a member of the Board since November 2024. Defendant Lee is named as a defendant in the *Retirement Trust* Action. As of March 7, 2025, Defendant Lee beneficially owned 218,618,368 shares of Primo Brands common stock, worth roughly $6.9 billion and constituting 57.5% of the Company's total outstanding shares.

24. Defendant Billy D. Prim ("Prim") has served as a member of the Board since November 2024. Defendant Prim is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Prim received $286,269 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Prim beneficially owned

1,079,056 shares of Primo Brands common stock, worth roughly $34.1 million.

25.     Defendant Kimberly Reed ("Reed") has served as a member of the Board since November 2024. Defendant Reed is named as a defendant in the *Retirement Trust* Action.

26.     Defendant Steven P. Stanbrook ("Stanbrook") has served as a member of the Board since November 2024. Defendant Stanbrook is named as a defendant in the *Retirement Trust* Action. According to the Company's public filings, Defendant Stanbrook received $265,808 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Stanbrook beneficially owned 104,522 shares of Primo Brands common stock, worth roughly $3.3 million.

***Former Director Defendants***

27.     Defendant Robbert Rietbroek ("Rietbroek") served as CEO and as a member of the Board of Primo Water from January 2024 until November 2024 and as CEO and as a member of the Board of Primo Brands from November 2024 until November 2025. Defendant Rietbroek is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Rietbroek received $25,990,984 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Rietbroek beneficially owned 88,802 shares of Primo Brands common stock, worth roughly $2.8 million.

28.     Defendant Joseph Rosenberg ("Rosenberg") served as a member of the Board from November 2024 until March 2025. Defendant Rosenberg is named as a defendant in the *Retirement Trust* Action.

29.     Defendant Allison Spector ("Spector") served as a member of the Board from November 2024 until May 2025. Defendant Spector is named as a defendant in the *Retirement Trust* Action.

30.     Defendant Kurtis Barker ("Barker") served as a member of the Board from

November 2024 until May 2025. Defendant Barker is named as a defendant in the *Retirement Trust* Action.

***Officer Defendants***

31.    Defendant David Hass ("Hass") has served as the Company's Chief Financial Officer ("CFO") since November 2024. Defendant Hass previously served as CFO of Primo Water from January 2023 until November 2024. Defendant Hass is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Hass received $7,117,232 in 2024 in compensation from the Company. As of March 7, 2025, Defendant Hass beneficially owned 215,414 shares of Primo Brands common stock, worth roughly $6.8 million.

32.    Defendant Jason Ausher ("Ausher") has served as the Company's Chief Accounting Officer since November 2024. Defendant Ausher previously served as Chief Accounting Officer of Primo Water from May 2015 until November 2024. Defendant Ausher is named as a defendant in the *Retirement Trust* Action. As of March 7, 2025, Defendant Ausher beneficially owned 111,181 shares of Primo Brands common stock, worth roughly $3.5 million.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

33.    By reason of their positions as officers and/or directors of Primo Brands, and because of their ability to control the business and corporate affairs of Primo Brands, the Individual Defendants owed Primo Brands and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Primo Brands in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Primo Brands and its shareholders.

34.    Each director and officer of the Company owes to Primo Brands and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Primo Brands, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.     To discharge their duties, the officers and directors of Primo Brands were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Primo Brands, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

39.    To discharge their duties, the officers and directors of Primo Brands were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Primo Brands were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Primo Brands' own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how Primo Brands conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Primo Brands and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Primo Brands' operations would comply with all applicable laws and Primo Brands' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

40.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Primo Brands.

41.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Primo Brands and were at all times acting within the course and scope of such agency.

42.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**<u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>**

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Primo Brands, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Primo Brands and at all times acted within the course and scope of such agency.

## PRIMO BRANDS' CODE OF BUSINESS CONDUCT AND ETHICS

49.    The Code of Conduct begins with a message from Defendant Rietbroek which

states, in pertinent part:

> This Code of Conduct (this "Code") provides practical direction on how to live our mission and values at work. It also gives guidance on following applicable laws and regulations and ethical standards expected for our business. Primo Brands is committed to doing business lawfully, responsibly and with integrity in all we do. This commitment includes the work done by our associates and suppliers.

> Our customers, associates, consumers and communities in which we do business trust us to do the right thing. If we do not act legally, ethically and with integrity, we can quickly lose their trust. This Code is a guide for applying ethical principles to everyday situations at work. If you do not understand something, ask for guidance – and help your fellow associates support and follow the Code.

> We are all responsible for supporting Primo Brands in operating its business with the highest standards of ethics and compliance. Together we can help ensure that Primo Brands continues to be an exceptional, ethical company.

50.     The Code of Conduct states that its purpose is to:

- Set expectations for our Company's culture and behavior for proper and ethical business conduct,

- Provide guidance on regulations, laws and policies that can affect your day-to-day activities,

- Provide guidance if you wish to make political and charitable contributions,

- Provide guidance on what actions you should take if faced with blackmail or extortion,

- Help protect the Company's assets, including business opportunities and confidential information,

- Inform you about the process to address issues and questions on appropriate business conduct, and

- Identify a confidential and, where permitted by law, anonymous way for you to report in good faith activities or actions that you believe may violate this Code without retaliation.

51.     The Code of Conduct applies to "all directors, officers and employees at all levels of Primo," and violations of the Code of Conduct will lead to disciplinary action including, but not limited to, "reprimand, probation, suspension, demotion, or termination of employment."

52.     In a section titled "Compliance with Laws," the Code of Conduct states, in pertinent part:

> Primo's business activities are required to comply with all laws and regulations that apply to our business. In all situations, even those in which specific legal rules do not exist, are unclear or seem to conflict, Primo associates are required to conduct Primo business in a way that will not embarrass Primo or compromise our integrity. By conducting our business ethically, we protect Primo's reputation today and for the future.

> In general, not knowing the law is not an excuse. So, you must be aware of laws that apply to Primo's business and be responsible for following these laws.

53.     In a section titled "Conflicts of Interest and Corporate Opportunities," the Code of Conduct states, in pertinent part:

> Associates are required to act in the best interests of the Company.  You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest."  A "conflict of interest" occurs when your own interests interfere, or even appear to interfere, in any way with your responsibilities to Primo or Primo's interests. This would include your personal, financial or private interests or the interests of a member of your family.

54.     In a section titled "Recordkeeping," the Code of Conduct states:

> Primo is required to submit many documents and reports to the U.S. Securities and Exchange Commission (the "SEC") and other regulators. These materials and any other Primo public communications must include disclosure that is full, fair, accurate, timely and easy to understand.

> You must be familiar with and comply with Primo's disclosure controls and procedures and its internal controls over financial reporting. You are responsible and accountable for the accurate reporting of all transactions in which you are directly involved or supervise. Accurate and reliable records are essential for Primo to meet its legal and financial obligations and to manage its business. You must keep books, records and accounts in a way that shows a fair and accurate accounting of all business transactions and use of assets, showing them in reasonable detail. Payment by Primo for goods and services shall be supported in all cases by invoices or other appropriate documentation reflecting the actual purpose of the payments. Payments may only be made to the people or businesses that supplied the goods and services, unless otherwise approved in advance by your supervisor.

> Falsifying a Primo company record is not allowed. Off-balance sheet transactions, arrangements and obligations must not be executed, and unrecorded funds or assets

must not be maintained, unless permitted by applicable law or regulation. If permitted, such transactions, arrangements, obligations and accounts, if material, must be disclosed in appropriate reports to the SEC. Any questions in this regard should be directed to Primo's Chief Financial Officer or General Counsel.

Officers and managers must maintain an internal accounting system with controls that:

- Prevent unauthorized, unrecorded or inaccurately recorded transactions, and

- Allow financial statements to be prepared that are based on generally accepted accounting principles.

You must cooperate fully with Primo's accounting department, internal audit department, independent public accountants and legal counsel. Managers must make sure that third parties that create or update Primo records follow the same rules, where appropriate.

Primo's senior financial officers and other associates working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These associates must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts. Any associate who becomes aware of inaccuracies contained in Primo's reports and public statements, or material omissions from Primo's reports and public statements, shall immediately report such material inconsistencies or omissions to Primo's Audit Committee and the General Counsel.

55.    In a section titled "Fair Competition," the Code of Conduct states:

Primo engages in free and fair competition everywhere it does business. Primo believes that unrestricted and honest competition is essential to the operation of the free enterprise system. Most countries have laws (often referred to as "antitrust" or "competition" laws) that prohibit restraint of trade through such activities as price-fixing, allocating customers or territories and abusing a dominant market position. Primo must follow these laws, which are an important contributor to the free markets in which Primo operates.

You should endeavor to deal fairly with Primo's customers, suppliers, competitors, associates and other business partners. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.

## PRIMO BRANDS' AUDIT COMMITTEE CHARTER

56.    Primo Brands' Audit Committee Charter states that the purpose of the Audit

Committee is to:

> Assist the Board in fulfilling the oversight responsibilities it has with respect to: (i) the integrity of the financial statements of the Corporation; (ii) the Corporation's compliance with legal and regulatory requirements; (iii) the qualifications and independence of the Corporation's independent auditor; (iv) the performance of the Corporation's internal auditors and independent auditor; and (v) disclosure controls, internal controls over financial reporting, and compliance with ethical standards adopted by the Corporation.

57.    In a section titled "Financial Statement and Disclosure Matters," the Audit

Committee Charter tasks the Audit Committee with the following responsibilities:

- Meet to review and discuss the annual audited financial statements with management and the independent auditor, including the Corporation's specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Corporation's Form 10-K.

- Meet to review and discuss the quarterly financial statements with management and the independent auditor, including the Corporation's specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Form 10-Q, including the results of the independent auditor's review of the Corporation's quarterly financial statements.

- Discuss with management and the independent auditor significant financial accounting and reporting issues, complex or unusual transactions and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles and the implementation thereof.

- Review and discuss with management and the independent auditor any issues as to the adequacy of the Corporation's internal controls, any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting and engage in resolution thereof.

- Prepare the report of the Committee required by the rules of the U.S.

Securities and Exchange Commission ("SEC") to be included in the Corporation's annual proxy statement and any other Committee reports required by applicable U.S. securities laws or NYSE rules.

- Discuss with management the Corporation's earnings press releases (including the use of any "pro forma" or "adjusted" non-GAAP information) prior to the public disclosure thereof by the Corporation, as well as financial information and earnings guidance provided to analysts and rating agencies.

- Discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures, if any, on the Corporation's financial statements.

- Review disclosures made to the Committee by the Corporation's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Corporation's internal controls.

- Review and discuss with management (including the senior internal audit executive) and the independent auditor the Corporation's internal controls report and the independent auditor's attestation of the report prior to the filing of the Corporation's Form 10-K.

58.   With respect to the Company's risk management function, the Audit Committee

Charter tasks the Audit Committee with the following responsibilities:

- Oversee the risk management activities of the Corporation, which will include holding periodic discussions with management regarding the Corporation's guidelines and policies with respect to risk assessment, risk management, and major strategic, financial and operational risk exposures such as fraud, cybersecurity, artificial intelligence and data privacy matters, and environmental, competitive and regulatory risks. The Committee shall receive regular reports regarding such risks and the steps management has taken to monitor and control any exposure resulting from such risks. The Committee shall, on at least an annual basis, facilitate a discussion with the Board regarding the Corporation's risk management function and the Corporation's major strategic, financial and operational risk exposures and disclosures.

- Review and discuss with the Board and others as it deems appropriate any litigation, claim or other contingency that could have a material effect upon the financial position or operating results of the Corporation.

- Oversee the Corporation's insurance programs, any renewals or replacements thereof, including in respect of directors' and officers' insurance and indemnification for members of the Board.

59.     With respect to the Company's internal audit function, the Audit Committee

Charter tasks the Audit Committee with the following responsibilities:

- The senior internal audit executive will report directly to the Chair of the Committee and administratively on a dotted line to the Corporation's Chief Financial Officer. The Committee will review and advise management on the selection and removal of the senior internal audit executive.

- Review the significant reports to management prepared by the internal audit department and management's responses.

- Periodically review, with the independent auditor, the internal audit department's responsibilities, budget and staffing and any recommended changes in the planned scope of the internal audit.

- Periodically review, with the senior internal audit executive, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the function's work.

- Annually review and recommend changes (if any) to the internal audit charter.

60.     In a section titled "Compliance Oversight Responsibilities," the Audit Committee

Charter tasks the Audit Committee with the following responsibilities:

- Obtain from the independent auditor assurance that Section 10A(b) of the Exchange Act has not been implicated.

- Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- Periodically review and discuss with management, the internal auditors, and the independent auditor the overall adequacy and effectiveness of the Corporation's legal, regulatory and ethical compliance programs, including the Corporation's Code of Business Conduct and Ethics. The Committee shall periodically receive from management confirmation of its compliance with material legal and regulatory compliance requirements. The Committee shall advise the Board

with respect to the Corporation's policies and procedures regarding compliance with applicable laws and regulations and with the Corporation's Code of Business Conduct. Consistent with these responsibilities, the Committee shall encourage continuous improvement of, and shall foster adherence to, the Corporation's policies, procedures, and practices at all levels. The Committee shall also provide for open communication among the independent auditor, management, the internal audit function, and the Board.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Corporation's financial statements or accounting policies.

- Discuss with the Corporation's General Counsel legal matters that may have a material impact on the financial statements or the Corporation's compliance policies and internal controls.

- In Order to properly carry out its responsibilities, have the authority, without seeking Board approval and to the extent it deems necessary or appropriate, to retain independent legal, accounting or other advisors and experts. The Corporation shall provide appropriate funding, as determined by the Committee, for payment of (i) compensation to the independent auditor for the purpose of rendering or issuing an audit report or performing other audit, review or attest services for the Corporation, (ii) compensation to any advisors employed by the Committee and (iii) payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

## **SUBSTANTIVE ALLEGATIONS**

*Background*

61.    Prior to the Relevant Period, the Company operated as Primo Water, a water solutions company that primarily sold bottled water and offered a water delivery service. On June 17, 2024, Primo Water announced an agreement to merge with BlueTriton, a beverage company previously known as Nestlé Waters North America, the bottled-water subsidiary of Nestlé, that owned a portfolio of national and regional water brands and operated a water and beverage delivery service known as "ReadyRefresh" (the "Merger"). After the Merger closed on November 8, 2024, the combined entity began operating under the name "Primo Brands." Pursuant to the Merger,

shareholders of Primo Water and BlueTriton exchanged their shares for shares of Primo Brands.

62.    On March 10, 2025, Primo Brands conducted a secondary public offering (the "SPOT"), in which 51,750,000 shares of Primo Brands common stock were issued to the public pursuant to a March 5, 2025 registration statement, declared effective by the SEC on March 10, 2025 (the "Registration Statement"), a March 10, 2025 preliminary prospectus supplement, and a March 11, 2025 final prospectus supplement (the "Prospectus" and, with the Registration Statement, the "SPO Documents").

**Materially False and Misleading Statements**

63.    On June 17, 2024, the Individual Defendants issued a press release announcing the Merger. The press release represented that the combined company would be positioned for "sustained long-term growth" due to its "significant financial and operating leverage" and "enhanced distribution capabilities."

64.    During a conference call on the same day, Defendant Rietbroek stated that "[Primo Brands] is positioned to generate meaningful cost synergies and value-creation opportunities." Defendant Hass added:

> In IT and ERP, we plan to optimize our functional software and expand the use of successful systems implementation further into the organization. We also plan to benefit from a recently implemented ERP by BlueTriton, which we expect to accelerate the modernization of our combined financial systems. Within our call center, we have an opportunity to better align our activities to deliver superior service at a lower cost.

65.    During the same call, Defendant Metropoulos stated, "I would like to thank the Primo Water and BlueTriton teams and our advisers for their hard work as we completed the proper due diligence necessary for a deal of this magnitude. Both companies come to this transaction from a position of financial strength." Defendant Metropoulos further represented that, "[b]y combining BlueTriton and Primo Water, we will create a leading North American platform, which combines

complementary businesses across various channels, formats, geographies and usage occasions."

66.    On August 8, 2024, the Company hosted an earnings call for the second quarter of 2024. During the call, Defendant Rietbroek stated, "From our production and distribution footprint to our ability as a combined company to elevate the customer experience, we're excited to provide a diverse array of water solutions for the residential, the commercial, and the retail customers."

67.    On November 7, 2024, the Company hosted an earnings call for the third quarter of 2024, during which Defendant Hass stated that "our improved financial profile and flexibility along with a compelling long-term growth outlook and the growth potential from our transaction with BlueTriton are a solid foundation for the future success of the new combined company, Primo Brands."

68.    During the same call, Defendant Rietbroek touted the prospects of the Merger and the Company's "integration planning efforts," stating:

> I am pleased that as the progress in defining the new Primo Brands organization has taken place, teams have been diligent in their integration planning efforts to hit the ground running upon closing. After the transaction was announced, we created working teams from both organizations that were tasked with identifying opportunities and planning to create an optimized structure to capture value across the organization once we close. We believe Primo Brands is positioned for success as a leading branded beverage company in North America with a leadership position in retail, residential, commercial, and away-from-home. We believe the combined company is positioned to deliver long-term growth, transform efficiencies and generate superior financial returns with premier brands, a unique platform, diversified assets and operations, an experienced executive team with representatives from both companies.

69.    Defendant Rietbroek additionally stated:

> We also have a strong direct-to-customer platform, which includes the sale and rent of dispensers, commercial, residential and away-from-home beverage delivery services; Water Exchange, a program where consumers can purchase and return their multi-use bottles directly; our in-store Water Refill selfserve business, where consumers can fill their own bottles using our dispensers inside and outside stores; and Water Filtration, where consumers can have a unit installed at their residential or commercial location. As a combined company, we will be able to provide even

more branded beverage solutions any time, any place, anywhere. We will be positioned to benefit from highly attractive market dynamics in U.S. bottled water. Our scale will allow us to become a stronger strategic partner with our retailers, helping them manage the bottled water category for growth.

70.     The following day, the Company issued a press release, announcing the completion

of the Merger and touting the growth prospects of the newly-combined entity:

With a highly competitive portfolio of brands, a variety of formats and offerings across price points, and a vertically integrated, coast-to-coast manufacturing and distribution network across North America, we believe ***Primo Brands is strategically positioned to accelerate growth, deliver superior products and services for our customers and consumers, and be a best-in-class U.S. beverage company.***

Primo Brands has an iconic brand portfolio, including billion-dollar, widely recognized brands such as Poland Spring® and Pure Life®, high-growth premium brands like Saratoga® and Mountain Valley®, and other valuable brands with significant growth potential, continued Mr. Rietbroek. ***Our goal is to drive sustainable, long-term shareholder value creation as we capture transformative operational efficiencies, achieve our synergy goals and deliver strong financial results. I want to thank our talented teams for their dedication and hard work in building our strong momentum.***

I believe Primo Brands is positioned to be a leader in the healthy hydration beverage category, thanks to the strength of its iconic, sustainably-sourced brands, its robust operations and extensive North American network, and its responsible operation of numerous springs across the country, said Dean Metropoulos, Non-Executive Chairman of the Board of Directors of Primo Brands.

***We have a clear strategy to accelerate growth driven by the strong demand for branded beverages and healthy hydration that continues to expand across all high-growth channels, including retail, clubs, restaurants, hospitality, convenience stores, hospitals, schools, offices and more***. Importantly, we also continue to strengthen Primo Brands' commitment to sustainability, including through our increasingly environmentally friendly delivery fleet, circular packaging efforts and water stewardship.

Primo Brands has an exciting future with premium, trusted brands that have a rich American heritage, six of which are more than 100 years old and four that date back to the 1800s, diverse assets and operations, a strong commitment to protecting our environment and communities, and highly engaged associates focused on execution, continued Mr. Metropoulos. Driving Primo and its differentiated advantages is a highly entrepreneurial and motivated executive team and Board of Directors that foster a positive and rewarding work environment for all of the

Company's associates and operate with a highly efficient performance culture. ***We believe the continued and consistent, multi-year growth across the combined company's portfolio, together with attractive margins, will continue to drive Primo Brands' value into the future.***[2]

71.    On February 20, 2025, the Company issued a press release, reporting fourth quarter and full year 2024 financial results. The press release quoted Defendant Rietbroek as stating, "I am pleased with the progress of our integration" as Primo Brands had "accelerated the size and speed of cost synergy capture." Defendant Rietbroek additionally represented that "[i]t is now forecasted to be $100 million higher and one year sooner, with $300 million in total expected by year end 2026. First-year 2025 synergies are estimated to be $200 million, with the balance occurring in 2026[,] and that "[t]he synergy capture is reflected in our 2025 outlook[.]"

72.    During an accompanying earnings call, hosted by the Company on the same day, Defendant Rietbroek represented that "all aspects of our business are aligning for ***flawless integration execution***, where we build a foundation for long-term growth by unifying the people, processes, policies, and platforms to maximize timely cost synergy capture, as well as to capture revenue synergies."

73.    During the same call, Defendant Hass stated the following with respect to the integration:

> Integration CapEx is expected to be approximately $200 million in 2025 and $50 million in 2026. Due to the strength at BlueTriton across our enterprise reporting platform, production and vertically integrated large-format bottle production, we are able to integrate these aspects of legacy Primo Water business into the asset base. The significant integration and volume shifts of the business into a single network and operating system will require some spend in key categories. These include onetime integration CapEx within IT to assist the transition of Primo Water ERP into the legacy BlueTriton systems, water production and capacity expansion, geographic location of our equipment, additional large-format blow molding equipment as well as other fleet and cooler asset standardization. We believe this will also allow future year growth to efficiently move through our vertically

---

[2] Unless indicated otherwise, all emphasis is added.

integrated and scaled production and distribution system. Combining these factors along with the core health and cash generation capacity of our business model, we are forecasting adjusted free cash flow of between $790 million and $810 million for 2025. This forecast assumes adding back acquisition and integration costs, in-year integration only CapEx as well as benefit of after-tax in-year synergy capture.

74.    In response to a question regarding the Company's revenue growth, Defendant Rietbroek stated that "[w]e're really looking at the business as, one, go-to-market system now[,]" with "one network, coast-to-coast network vertically integrated that serves both commercial and residential customers as well as retail customers and foodservice customers as well as small format." Defendant Rietbroek continued, stating that "the strength of this unique go-to-market system is that unique distribution model that we can fully leverage and gives us scale and allows us to grow accretively as one end-to-end business model."

75.    On March 10, 2025, the Company conducted the SPO. The SPO Documents represented that the Company's "combined platform brings together BlueTriton's iconic portfolio of brands and retail distribution strength with Primo Water's complementary branded large format and direct-to-consumer offering." The SPO Documents additionally stated that "[t]he increased scale and reach of our North American platform make the Company well positioned to take share of and sustainably grow in the large U.S. beverage category." Finally, the SPO Documents claimed that the Company had identified "estimated $300 million run-rate cost synergies opportunity[,]" and that the synergies would "streamline our cost structure and optimize our operations, procurement, IT/ERP, call center and SG&A functions."

76.    On March 20, 2025, Primo Brands filed a proxy statement on Form DEF 14A with the SEC (the "2025 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Rietbroek, Metropoulos, Barker, Bomhard, Cates, Cramer, Foss, Fowden, Lee, Prim, Reed, Spector, and Stanbrook and the compensation of certain of the Company's executive

officers, including Defendants Rietbroek, Hass, and Ausher.

77. With respect to the integration of Primo Water and BlueTriton, the 2025 Proxy states that the Integration Committee of the Board is responsible for:

- ensuring that the activities related to the integration of the businesses of Primo Water and BlueTriton following the Closing align with the overarching strategic vision and priorities established by the Board;

- monitoring and assessing integration milestones, deliverables, and timelines;

- overseeing the integration of key business functions, including sales, marketing, finance, human resources, and operations, to ensure smooth operational transitions;

- supporting efforts to blend organizational cultures, reinforcing our shared values, mission, and vision; and

- identifying, evaluating, and addressing any risks associated with the integration process, including operational, financial, and regulatory risks, and ensuring appropriate mitigation strategies are in place.

78. With respect to the Company's internal controls and its legal and ethical compliance, the 2025 Proxy states:

The Audit Committee is responsible for overseeing the Company's corporate accounting and financial reporting process and assisting the Board in its oversight of (i) the integrity of the financial statements of the Company; (ii) the Company's compliance with legal and regulatory requirements; (iii) the qualifications and independence of the Company's independent auditor; (iv) the performance of the Company's internal auditors and independent auditor; and (v) disclosure controls, internal controls over financial reporting, and compliance with ethical standards adopted by the Company.

79. With respect to the Company's risk management function, the 2025 Proxy states:

The Board has extensive involvement in the oversight of risk management related to the Company and our business and accomplishes this oversight primarily through the Audit Committee. To that end, the Audit Committee will hold periodic discussions with management regarding our guidelines and policies with respect to risk assessment, risk management, and major strategic, financial, and operational risk exposures such as fraud, cybersecurity, artificial intelligence, and data privacy matters, and environmental, competitive, and regulatory risks. The Audit

Committee will also receive regular updates regarding such risks and the steps management has taken to monitor and control any exposure resulting from such risks. On at least an annual basis, the Audit Committee will facilitate a discussion with the Board regarding our risk management function and our major strategic, financial, and operational risk exposures and disclosures.

80.    On May 8, 2025, the Company hosted an earnings call for the first quarter of 2025. During the call, Defendant Rietbroek stated that "all aspects of our business are aligning for *flawless* integration execution," adding that the Company was positioned to "achieve our 2025 financial guidance, which includes capturing $200 million in cost synergies opportunity as we ramp up through the balance of the year."

81.    During the same call, Defendant Hass stated the following with respect to the integration:

> While many companies in today's environment are stepping back to review and adjust their cost structures and drive efficiencies, Primo Brands remains in a strong position to quickly extract and leverage the benefits of our merger. We began to immediately deploy our integration playbook at the time of our merger to remove duplicative costs and seek a leaner cost structure. This also allows us to review all aspects of the businesses we are combining without a lot of risks to our offerings as we're largely driving efficiencies and streamlining into a single-company operating structure. We will continue to prioritize executing our cost synergy capture in 2025 to drive our profitability and leverage a single production and operations footprint.

82.    On May 14, 2025, Defendant Rietbroek participated at the 2025 BMO Farm to Market Chemicals Conference on behalf of the Company. In response to a question regarding the progress of the integration, Defendant Rietbroek stated:

> Obviously, integrations are tough, right? Nothing is perfect. I mean it's full of learning. So that's why we have phases, and we call them R1, R2, R3, R4 and R5. So we are going through a third phase now of branch integrations. The first one was small. We tested the system, we learned how to improve, then we did a slightly bigger one. And we do it city by city. So we'll do Dallas, we'll do Los Angeles, we'll do Colorado. And we're learning and it's not perfect, and we're fixing on the fly. *That's why the focus for this year is truly primarily the integration and getting to a flawless integration, so that by the time we get into 2026, you all see a true picture of this business. It's far from perfect, but it is working well.* We've not

had major hiccups. But think about things like data integrity when you're transferring a database from one system to another. Enterprise software, so migrating our facilities into SAP. Those are all single individual projects that go side by side that need entire multifunctional teams to execute with excellence.

83.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company's direct delivery business, including ReadyRefresh, began experiencing significant operational disruptions immediately following the Merger; (ii) despite the Individual Defendants touting the Company's "flawless integration execution" the Company failed to successfully integrate Primo Water and BlueTriton; (iii) as a result of the operational disruptions and the Company's failure to execute on the integration, Primo Water experienced customer service issues; (iv) despite descriptions in the 2025 Proxy of the Board's and its committees' oversight responsibilities with respect to the integration and the Company's internal controls and legal and ethical compliance, the Board and its committees failed to adequately exercise these functions and caused and/or permitted the Company to issue the materially false and misleading statements detailed herein; and (v) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Gradually Emerges***

84.    On August 7, 2025, the Company announced its second quarter 2025 financial results. During an earnings call, hosted by the Company the same day, Defendant Rietbroek disclosed that "[t]he speed by which we closed facilities and reduced headcount led to disruptions in product supply, delivery, and service." Despite the disclosure, Defendant Rietbroek concealed the full extent of the Company's issues and attempted to assuage investor concerns by claiming that the Company was "now on the right trajectory as we enter the second half of the year" and

that it would "continue to execute against our strategy and must-win priorities while resolving our service issues."

85.    On this news, the price of Primo Brands stock declined 9%, from a close of $26.41 per share on August 6, 2025 to a close of $24.00 per share on August 7, 2025.

86.    On November 6, 2025, Primo Brands significantly reduced its full year 2025 net sales and adjusted EBITDA guidance and reported that Defendant Rietbroek would be replaced as CEO of the Company. During the accompanying earnings call, Defendant Hass reported that the Company expected a "net sales decline in the low single digits versus the prior year" and adjusted EBITDA of "approximately $1.45 billion" at the midpoint.

87.    During the earnings call, Defendant Foss conceded that "most of the direct delivery disruption has been self-inflicted" and that the Company "probably moved too far too fast on some of the various integration work streams," adding that "[t]here's no doubt that speed impacted our ability to get through a lot of the warehouse closures and route realignment without disruption." Defendant Foss revealed "customer services issues" and "integration issues related to the technology move over." With respect to the Company's ongoing customer service issues, Defendant Foss stated that "there is more work to do on this front to completely get the issue solved and corrected."

88.    On this news, the price of Primo Brands stock declined more than 36%, from a close of $22.66 per share on November 5, 2025 to a close of $14.46 per share on November 7, 2025.

89.    Analysts reacted negatively to the disclosure. For example, analysts from JPMorgan reported that "[t]he 3Q25 print was another in a series of disappointments since the merger between Primo Water and BlueTriton with another significant guidance cut and now CEO

change," citing the decline in the Company's stock price as a reflection of the "confounding 4Q25 guide, potential implications for 2026 top-line/earnings power, and overall lack of investor confidence in the company." Similarly, analysts from Barclays reported that "the outsized stock reaction…tells us this seemingly has more to do with credibility than anything else," and that "trends will get worse before they get better."

***Repurchases of Common Stock During the Relevant Period***

90.     According to the Company's public filings, during the Relevant Period, while the price of the Company's stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 3 million shares of its own stock for a total of roughly $73.2 million.

91.     Specifically, according to the Company's quarterly report, filed on Form 10-Q with the SEC on November 6, 2025 for the fiscal quarter ended September 30, 2025, Company management authorized a share repurchase program on August 6, 2025 of up to $250.0 million in Class A common stock. As of September 30, 2025, the Company had repurchased 3,011,204 shares of its Class A common stock for an aggregate price of $73.2 million.

92.      Given that the price of Primo Brands stock was $14.46 after the corrective disclosures on September 18, 2023, the true value of the 3,011,204 repurchased shares was roughly $43.5 million. Accordingly, Company management caused the Company to overpay by approximately $29.7 million to repurchase these shares.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

94.     Primo Brands is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

95.     Plaintiff is a current shareholder of Primo Brands and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

96.     At the time this action was commenced, the ten-member Board was comprised of Defendants Foss, Metropoulos, Bomhard, Cates, Cramer, Fowden, Lee, Prim, Reed, and Stanbrook. Accordingly, Plaintiff is only required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

97.     The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

98.     The Individual Defendants either knowingly or recklessly issued or caused the

Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

99.     As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Primo Brands, the Individual Defendants knew, or should have known, the material facts surrounding the material deficiencies in the Company's internal controls over financial reporting.

100.     Each of the Individual Defendants is not disinterested or independent, and therefore, is incapable of considering a demand because they are named as defendants, and face significant personal liability, in the *Retirement Trust* Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

101.     Defendants Metropoulos and Lee are not disinterested or independent and are therefore incapable of considering a demand. Defendant Metropoulos received substantial income from his employment with the Company. For example, Defendant Metropoulos received $10,586,537 in 2024 in compensation from the Company. Defendant Lee is the beneficial owner of 57.5% of the Company's total outstanding shares of common stock. The Company admits that Defendants Metropoulos and Lee have relationships with the Company that would materially interfere with their independent judgment and are not independent pursuant to the standards set forth by NYSE.

102.    Defendants Bomhard, Cates, and Cramer either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements and internal controls over financial reporting. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the adequacy of the Company's internal controls over financial reporting as alleged above. Therefore, Defendants Bomhard, Cates, and Cramer cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

103.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein.

104.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Primo Brands. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

Individual Defendants were to sue themselves or certain officers of Primo Brands, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

105.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Primo Brands to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

106.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

### COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duties

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

109.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

110.    The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

112. Plaintiff, on behalf of Primo Brands, has no adequate remedy at law.

### COUNT II
**Against the Individual Defendants**
**For Aiding and Abetting Breach of Fiduciary Duty**

113. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114. By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have

each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

115.    Plaintiff, on behalf of Primo Brands, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for**
**Unjust Enrichment**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Primo Brands.

118.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Primo Brands that was tied to their performance or to the artificially inflated valuation of Primo Brands.

119.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

120.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

121.    Plaintiff, on behalf of Primo Brands, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Violations of Section 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

122.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

123.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Primo Brands. Not only is Primo Brands now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Primo Brands by the Individual Defendants.

124.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $29.7 million to repurchase roughly 3,011,204 shares.

125.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

126.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Primo Brands not misleading.

127.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Primo Brands.

128.    The Individual Defendants acted with scienter during the Relevant Period, in that

they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

129.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT V
**Against the Individual Defendants for Violations of Section 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

132.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the integration of Primo Water and BlueTriton and the Company's internal controls and legal and ethical compliance.

133.    The 2025 Proxy was used to solicit shareholder votes in connection with the election of Defendants Rietbroek, Metropoulos, Barker, Bomhard, Cates, Cramer, Foss, Fowden, Lee, Prim, Reed, Spector, and Stanbrook to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants

Rietbroek, Hass, and Ausher.

134.     Describing the Company's executive compensation policy, the 2025 Proxy indicated that the compensation is performance-based, stating that the Company's compensation program is "focus[ed] on variable compensation that rewards the achievement of short-term and long-term goals and emphasizes Primo Brands' commitment to pay-for-performance."

135.     While the shareholder vote on executive compensation was non-binding, the 2025 Proxy indicated that "the Board and the Compensation Committee value the opinions of our stockholders and intend to consider our stockholders' views regarding how often they should have the opportunity to approve our executive compensation programs."

136.     The materially false and misleading statements contained in the 2025 Proxy regarding the integration of Primo Water and BlueTriton and the Company's internal controls and legal and ethical compliance therefore misleadingly induced shareholders to vote in favor of the election of Defendants Rietbroek, Metropoulos, Barker, Bomhard, Cates, Cramer, Foss, Fowden, Lee, Prim, Reed, Spector, and Stanbrook and performance-based compensation to Defendants Rietbroek, Hass, and Ausher, to which they were not entitled.

137.     The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

### COUNT VI
**Against the Individual Defendants for**
**Waste of Corporate Assets**

138.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Primo Brands' internal controls, by issuing, causing the

issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

140.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

141.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

142.    Plaintiff, on behalf Primo Brands, has no adequate remedy at law.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Primo Brands to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Primo Brands and its stockholders from a repeat of the damaging events described herein, including, but

not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 17, 2025             **LACHTMAN COHEN**
**& BELOWICH LLP**


By: ***/s/ Brian S. Cohen***
Brian S. Cohen
500 West Putnam Avenue, Suite 400
Greenwich, CT 06830
Telephone: (203) 404-4960
Email: bcohen@lcb-law.com

**RIGRODSKY LAW, P.A.**
Samir Aougab
Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sa@rl-legal.com
Email: gms@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com
***Attorneys for Plaintiff***

## <u>VERIFICATION OF YADIRA TORRES</u>

I, Yadira Torres, am a plaintiff in this action. I have reviewed the allegations made in the

Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As

to those allegations of which I have personal knowledge, I believe those allegations to be true. As

to those allegations of which I do not have personal knowledge, I rely upon my counsel and their

investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____                    12/11/2025
                                            _____
                                                    Yadira Torres